UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

KAREN CHRISTINE ROSS,

                          Plaintiff,        **No. 6:16-cv-06618(MAT)**
                                            **DECISION AND ORDER**

              -vs-

CAROLYN W. COLVIN, ACTING COMMISSIONER
OF SOCIAL SECURITY,

                          Defendant.

_____

## I.   Introduction

Represented by counsel, Karen Christine Ross ("Plaintiff")
instituted this action pursuant to Titles II and XVI of the Social
Security Act ("the Act"), seeking review of the final decision of
the Acting Commissioner of Social Security ("the Commissioner")[1]
denying her application for Disability Insurance Benefits ("DIB")
and  Supplemental  Security  Income  ("SSI").  The  Court  has
jurisdiction over the matter pursuant to 42 U.S.C. §§ 405(g),
1383(c).

## II.  Procedural Status

Plaintiff protectively filed for DIB and SSI on August 7,
2013, alleging disability beginning September 1, 2010. The
applications  were  denied  on  October  23,  2013,  and  Plaintiff

---

[1]
    Nancy A. Berryhill became the Acting Commissioner of Social Security on
January 20, 2017. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil
Procedure, Nancy A. Berryhill should be substituted, therefore, for Acting
Commissioner Carolyn W. Colvin as Defendant in this suit. No further action need
be taken to continue this suit by reason of the last sentence of section 205(g)
of the Social Security Act, 42 U.S.C. § 405(g).

requested a hearing. Administrative Law Judge Rosanne M. Dummer ("the ALJ") conducted a hearing on December 4, 2014, via videoconference. Plaintiff appeared with her attorney and testified. Stephen P. Davis, an impartial vocational expert ("the VE"), also testified at the hearing, via videoconference telephone.

On December 4, 2014, the ALJ sent the objective record evidence by query with interrogatories to Stuart Gitlow, M.D., MPH Board Certified in General Medicine and Addiction and Forensic Psychiatry. Dr. Gitlow's response and professional qualifications were sent to Plaintiff's attorney, who did not provide any response. After the hearing, the ALJ also received into the record treatment notes from March of 2014, to September of 2014 (pulmonary treatment), and from November 2013, to September 2014 (Unity Family Medicine).

On January 26, 2015, the ALJ issued an unfavorable decision. (T.14-38).[2] The Appeals Council denied Plaintiff's request for review on July 14, 2016, making the ALJ's decision the final decision of the Commissioner. Plaintiff then timely commenced this action.

## III. The ALJ's Decision

At the outset, the ALJ noted that Plaintiff previously had filed two sets of applications for DIB and SSI, the last of which

---

[2]
Citations to "T." in parentheses refer to pages from the certified administrative transcript.

was denied at the initial level on July 19, 2012, and no further review was sought. Since Plaintiff had alleged an onset date of disability within the previously adjudicated time period, the ALJ found there was an implied request for reopening. However, the ALJ found no basis to reopen the prior denials, which were final and binding through July 19, 2012, meaning that the relevant period commenced July 20, 2012. (T.17).

The ALJ then found that Plaintiff meets the insured status requirements of the Act through December 31, 2015, and had not engaged in substantial gainful activity since September 1, 2010.

At step two, the ALJ determined that Plaintiff has the following severe impairments: bipolar disorder, and alcohol dependence and marijuana abuse in reported remission. The ALJ found that Plaintiff's asthma appeared to stable on medication, and was not severe. The ALJ noted that Plaintiff also reported elbow pain, bilaterally; x-rays taken in December 2011, showed spurring of the right and left elbow and degenerative changes of the left elbow. The ALJ observed that Plaintiff reported she could not lift five pounds with either arm, "though no evidence indicates significant musculoskeletal treatment or that follow[-]up was required." Therefore, the ALJ concluded that Plaintiff's elbow impairment was not severe. The ALJ noted that Plaintiff reported right leg muscle weakness, but it did "not appear related to a medically determinable impairment[,]" and was not severe. In addition, the

ALJ considered notations in the record by social workers mentioning a psychotic disorder. Since the assessment of a psychotic disorder was noted by Plaintiff's providers in connection with her substance use, the ALJ considered the reported psychotic symptoms in connection with Plaintiff's severe impairments above.

At step three, the ALJ determined that the severity of Plaintiff's mental impairments, considered singly and in combination, do not meet or medically equal the criteria of any listed impairment, see 20 C.F.R. § Pt. 404, Subpt. P, App. 1 (eff. Jan. 2, 2015, to May 17, 2015). The ALJ particularly considered Listings 12.04 (affective disorders) and 12.09 (substance addiction disorders).

Prior to proceeding to step four, the ALJ assessed Plaintiff as having the residual functional capacity ("RFC") to perform a range of medium work as defined in 20 C.F.R. § 404.1567(c). Plaintiff could lift/carry about 50 pounds occasionally and 25 pounds frequently; sit about six of eight hours and stand/walk about six of eight hours; should avoid concentrated exposure to pulmonary irritants; should avoid concentrated exposure to work hazards; is able to understand, remember, and carry out simple instructions; can sustain attention for simple tasks for extended periods of two-hour segments in an eight-hour day; is able to tolerate brief and superficial contact with others; and is able to

adapt to changes for simple, routine, and repetitive type tasks. (T.21).

At step four, the ALJ found that Plaintiff cannot perform any of her past relevant work as a (1) certified nurse assistant (Dictionary of Occupational Titles ("DOT") code: 355.674-014) medium level (performed at heavy), Specific Vocational Preparation ("SVP") 4, semi-skilled; (2) day-care provider (DOT code: 301.677-010) medium level, SVP 3, semi-skilled; (3) teacher's aide (DOT code: 249.367-074) light level (performed at medium), SVP 3, semi-skilled; or (4) package sealer (DOT code: 920.685-074) medium level, SVP 2, unskilled. The demands of all these jobs exceeded Plaintiff's RFC. (T.32).

At step five, the ALJ noted that Plaintiff was 50 years-old, defined as an individual closely approaching advanced age, with a limited (eleventh grade) education. (T.32). The ALJ found that transferability of job skills was not material to disability determination because the Medical-Vocational Rules ("the Grids") supported a finding of "not disabled," whether or not Plaintiff has transferable job skills. (T.33).

The ALJ relied on the VE's testimony that a person of Plaintiff's age, and with her education, work experience, and RFC, could perform the requirements of various unskilled medium and light occupations that exist in significant numbers nationally and in New York State. Examples of jobs at the unskilled medium level

provided by the VE were (1) hand packager (DOT code: 920.587-018); (2) marker (DOT code: 369.687.026); (3) linen clerk (DOT code: 222.387-030); (4) meat clerk (DOT code: 222.684-014); and (5) stacker (DOT code: 222.587-046). Examples of jobs at the unskilled light level provided by the VE were (1) shipping and receiving weigher (DOT code: 222.387-074); (2) toy assembler (DOT code: 731.687-034); and (3) assembler of glass products (DOT code: 739.687.194). At the hearing, the ALJ also presented the VE with hypotheticals regarding an individual of Plaintiff's age, and with her education, work experience, and certain additional, non-exertional limitations. In response, the VE testified that if an individual were further limited to only occasional public contact, the job of meat clerk would be precluded, but all other jobs he identified would remain available.

## IV.  Scope of Review

When considering a claimant's challenge to the decision of the Commissioner denying benefits under the Act, the district court is limited to determining whether the Commissioner's findings were supported by substantial record evidence and whether the Commissioner employed the proper legal standards. Green-Younger v. Barnhart, 335 F.3d 99, 105-06 (2d Cir. 2003). The district court must accept the Commissioner's findings of fact, provided that such findings are supported by "substantial evidence" in the record. See 42 U.S.C. § 405(g) (the Commissioner's findings "as to any

fact, if supported by substantial evidence, shall be conclusive"). The reviewing court nevertheless must scrutinize the whole record and examine evidence that supports or detracts from both sides. Tejada v. Apfel, 167 F.3d 770, 774 (2d Cir. 1998) (citation omitted). In addition, "[t]he deferential standard of review for substantial evidence does not apply to the Commissioner's conclusions of law." Byam v. Barnhart, 336 F.3d 172, 179 (2d Cir. 2003) (citing Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984)).

## V. Discussion

### A. Physical RFC Unsupported by Substantial Evidence Due to ALJ's Failure to Obtain a Consultative Physical Examination (Plaintiff's Point I)

Plaintiff argues that the ALJ improperly determined that all of her physical impairments were non-severe without any opinion from an acceptable medical source. Plaintiff notes that the only medical opinion regarding her physical limitations in the record was from Physician's Assistant Sandra Williams ("PA Williams") at Unity Health Family Health (St. Mary's). Plaintiff contends that the ALJ's rejection of PA Williams' opinion created a "paradox" for the ALJ: "no acceptable medical source to identify Plaintiff's medically determinable physical impairments, but an opinion from her treating other source that indicated [she] would be capable of, at best, sedentary work." (Plaintiff's Memorandum of Law ("Pl's

Mem.") (Dkt #12-1) at 12). According to Plaintiff, the situation required the ALJ to order a consultative physical examination.[3]

PA Williams provided almost all of Plaintiff's primary care treatment through the period from 2011 to 2014. On February 19, 2011, Plaintiff presented to PA Williams with, among other things, "elbow pain [due to] congenital abnormality where she cannot straighten either elbow since a child[,]" and in the past year she "has been having some aching worse with cold weather." (T.249). Under assessment/plan, PA Williams noted that the elbow condition was under "sub-optimal control," and she ordered x-rays to check for arthritis. Plaintiff was to follow up "as needed," and take non-steroidal anti-inflammatories ("NSAIDs") as needed. (T.250). On April 18, 2012, PA Williams wrote that the x-ray had been done; impression was "[history] congenital abnormality bilat[eral] elbows." (T.295). PA Williams noted that the elbow condition was "stable," and instructed her to take NSAIDs, and to follow up, on an as-needed basis. (T.296). On June 2, 2014, PA Williams indicated that she completed a Department of Social Services ("DSS") form and indicated that, due to Plaintiff's degenerative arthritis of the elbow (stable), she was able to work 40 hours a

_____

[3]
The regulations provide that the Social Security Administration ("SSA") "may purchase a consultative examination to try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow [it] to make a determination or decision on [a] claim." 20 C.F.R. §§ 404.1519a, 416.929a.

week with the following restrictions: "no carrying over 5 lbs each arm, no overhead reaching [for] one year." (T.823). Due to Plaintiff's right leg weakness (stable), she could engage in "no prolonged standing [longer than] 15 min." (Id.).

Physician's assistants are defined as "other sources" under the Regulations; they do not constitute "acceptable medical sources" entitled to the presumption of deference under the treating physician rule. E.g., Genier v. Astrue, 298 F. App'x 105, 108 (2d Cir. 2008) (unpublished opn.); SSR 06-3p, 2006 WL 2329939 (S.S.A. Aug. 9, 2006). While, as a general rule, opinions from "other sources" are not entitled to controlling weight, SSR 06-3p recognizes that "other source" opinions "are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." SSR 06-3p, 2006 WL 2329939, at *3. SSR 06-03p states that the same factors used in evaluating the opinions of "acceptable medical sources" can be used to evaluate the opinions of "medical sources who are not 'acceptable medical sources,'" although "[n]ot every factor for weighing opinion evidence will apply in every case." Id. at *4.

Here, the ALJ afforded PA Williams' statement "little weight" because "[n]o treatment appear[ed] to be indicated for [Plaintiff's] elbow symptoms." That is not a correct reflection of the record. Plaintiff was prescribed conservative treatment for her

elbow pain, but the fact remains that she has a congenital abnormality of both elbows that was confirmed by radiographic studies. (T.818). Both elbows showed degenerative changes: On the right, Plaintiff had "[s]ignificant spurring involving the anterior aspect of the joint," and "[d]egenerative spurring of the right elbow." (T.818). On the left, she had "mild spurring involving anterior aspect of the elbow joint" and "[m]ild degenerative changes of the left elbow." (Id.). The ALJ also offered the following confusing statement for rejecting PA Williams' opinion about Plaintiff's limitations for prolonged standing:

> [a]s to leg weakness, the undersigned notes the claimant has some obesity, and to the extent she *could* lose weight *would appear* to improve overall functioning, *including any joint complaints*, though *no debilitating problems are indicated*.

(T.30 (emphases supplied)). This is problematic for several reasons. First, the ALJ is improperly attempting to "play doctor" by speculating as to what would improve Plaintiff's leg weakness (according to the ALJ, weight-loss). "This assessment is the result of a hunch and an ALJ may not rely on a hunch." Blakes ex rel. Wolfe v. Barnhart, 331 F.3d 565, 570 (7th Cir. 2003); see also Primes v. Colvin, No. 6:15-CV-06431(MAT), 2016 WL 446521, at *4 (W.D.N.Y. Feb. 5, 2016) (finding error where ALJ stated, in regards to claimant's back injury, that "[g]iven that the claimant's strength in his lower extremities is within normal limits, it is reasonable to assume that the claimant walks a reasonable amount

during the day") (citing <u>Blakes</u>, 331 F.3d at 570; internal citations and citation marks omitted). Second, the ALJ "seems to have succumbed to the temptation to play doctor[,]" <u>Blakes</u>, 331 F.3d at 570 (7th Cir. 2003), by concluding, without a competent medical opinion, that the cause of Plaintiff's leg weakness is so-called "joint complaints" in unspecified joints. The ALJ's final statement, "no debilitating problems are indicated," is conclusory and vague; it is unclear what is meant by "debilitating problems," and the ALJ rejected the only quantified opinion on any limitations caused by Plaintiff's leg weakness. The ALJ cannot simply ignore Plaintiff's leg weakness because, standing alone, it is not disabling; the regulations require the ALJ to account for limitations imposed by both severe and non-severe impairments when formulating the RFC. <u>See</u> 20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2) ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe [ ]' . . . when we assess your [RFC]. . . ."); <u>see</u> <u>also</u>, <u>e.g.</u>, <u>Davis v. Comm'r of Soc. Sec.</u>, No. 5:16-CV-0657(WBC), 2017 WL 2838162, at *6 (N.D.N.Y. June 30, 2017) ("Even if the ALJ properly determined that [the claimant]'s cervical spine impairment was non-severe, the ALJ must still take that impairment into consideration when formulating the RFC. Further, because the ALJ must consider all of [the claimant]'s impairments, severe and non-severe, in formulating her RFC

determination, it was inapposite for the ALJ to discredit the entirety of the treating sources' medical statements providing limitations based on a combination of [the claimant]'s impairments because one such impairment was deemed non-severe."). In sum, the Court finds that the ALJ's rationale for rejecting PA Williams' opinion about Plaintiff's physical impairments is legally erroneous and unsupported by substantial evidence. The Court further finds that the ALJ should have requested a consultative examination or submitted a physical RFC questionnaire to an acceptable medical source from Plaintiff's primary care practice concerning the extent of limitations due to Plaintiff's physical impairments.

**B. Failure to Re-Contact Plaintiff's Treating Psychiatrist (Plaintiff's Point II)**

Plaintiff asserts that the ALJ erred in assigning the opinion (T.748-53) offered by her treating psychiatrist, Dr. Dinesh M. Nanavati, only "limited weight" (T.29-30), without re-contacting Dr. Nanavati for clarification. Plaintiff reasons that the ALJ must have had unanswered questions regarding the record, because she sent interrogatories to a non-treating, non-examining, State agency physician, Dr. Gitlow. Plaintiff contends those questions about the severity of her mental impairments were more properly directed to her treating psychiatrist, whose opinion was consistent with the opinions offered by treating social worker Sheri Kreher ("SW Kreher"). The Commissioner counters that even the absence of a

treating source opinion does not necessarily trigger the ALJ's obligation to develop the record, and, in any event, the ALJ properly weighed Dr. Nanavati's opinion and provided good reasons for the weight she afforded it.

In evaluating a treating source's opinion, the regulations instruct adjudicators to consider the following factors: (1) "[l]ength of the treatment relationship and the frequency of examination;" (2) "[n]ature and extent of the treatment relationship;" (3) "[s]upportability" of the opinion; (4) "[c]onsistency" of the opinion "with the record as a whole;" (5) whether the source is opining about an area in which he or she specializes; and (6) "[o]ther factors" brought to the Commissioner's attention. 20 C.F.R. § 404.1526(d)(2) (eff. Aug. 24, 2012, until Mar. 26, 2017). A corollary to the treating physician rule is the so-called "good reasons rule," which provides that the SSA "will always give good reasons in [its] notice of determination or decision for the weight [it] gives [claimant's] treating source's opinion." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). "Those good reasons must be 'supported by the evidence in the case record, and must be sufficiently specific . . . .'" <u>Blakely v. Comm'r of Soc. Sec.</u>, 581 F.3d 399, 406 (6th Cir. 2009) (quoting Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *5 (S.S.A. July 2, 1996)). Because the "good reasons" rule exists to "ensur[e] that each denied claimant receives fair process," <u>Rogers v. Comm'r</u>

of Soc. Sec., 486 F.3d 234, 243 (6th Cir. 2007), an ALJ's "'failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight' given '*denotes a lack of substantial evidence*, even where the conclusion of the ALJ may be justified based upon the record.'" Blakely, 581 F.3d at 407 (quoting Rogers, 486 F.3d at 243; emphasis in Blakely).

On April 29, 2014, Dr. Nanavati completed a Mental Residual Functional Capacity Questionnaire (T.748-53), indicating an Axis I diagnosis of Bipolar Disorder (296.54), no Axis II or III diagnoses, and an Axis IV diagnosis of economic problems. With regard to treatment and response, Dr. Nanavati stated that Plaintiff was "very engaged" and followed all recommendations, but her "mental illness is moderate [to] severe and causes significant impairments" because she "can have periods of severe depression with suicidal ideation, hopelessness and mild psychosis" as well as "periods of high irritability and impulsive behaviors." (T.748). Dr. Nanavati opined that she was "unable to meet competitive standards" in connection with the following mental abilities and aptitudes needed for unskilled work: maintain regular attendance, sustain an ordinary routine without special supervision, perform at a consistent pace without an unreasonable number and length of rest periods, and deal with normal work stress. (T.750). He opined that she had "no useful ability to function" with regard to completing

-14-

a normal workday and workweek without interruptions from psychologically based symptoms. (Id.). Dr. Nanavati noted that it was "important for her to take all medications, which can cause drowsiness and mental fog," and he anticipated that her impairments would cause her to be absent from work more than 4 days per month. (T.752).

As an initial matter, the Court finds that the length of Dr. Nanavati's treatment relationship with Plaintiff; the frequency of his examination of Plaintiff; the nature and extent of their treatment relationship; and the fact that Dr. Nanavati is a specialist in the area about which he is rendering an opinion all favor according greater weight to his opinion. Dr. Nanavati saw Plaintiff regularly over a few years, and, as a psychiatrist, is well-qualified to opine on the limitations caused by Plaintiff's mental impairments.

The ALJ, however, afforded Dr. Nanavati's opinion little weight (see T.29-30) because she found it to be "inconsistent with the overall record evidence[,]" as well as Dr. Nanavati's "fifteen-minute medications checks, . . . noting no overall concern." (T.30). First, a statement that a treating source's opinion is inconsistent with the overall record evidence, without specifying the items of evidence with which it is at odds, is too vague to allow meaningful review by the district court, and is not a "good reason." See, e.g., Marthe v. Colvin, No.

6:15-CV-06436(MAT), 2016 WL 3514126, at *7 (W.D.N.Y. June 28, 2016) ("The ALJ did not point to any other evidence to support his contention that [the treating physician]'s opinion was 'somewhat' inconsistent with his treatment notes. By failing to identify the alleged inconsistencies between [the treating physician]'s RFC questionnaire and the 7 years of treatment notes, the ALJ has failed to provide any basis for rejecting [the treating physician]'s opinion, much less the requisite 'good reasons' based on substantial evidence."). Second, the ALJ took an unjustifiably narrow view of Dr. Nanavati's treatment records by only referring to his appointments with Plaintiff for medication checks. It is apparent from the record that Plaintiff's psychiatric treatment team consisted of, not just Dr. Nanavati, but various social workers in the same practice who conducted individual therapy sessions with Plaintiff and coordinated group therapy sessions in which she participated. For instance, Plaintiff engaged in regular individual therapy sessions with Licensed Clinical Social Worker Sheri Kreher ("LCSW Kreher") throughout 2012, 2013, and 2014. LCSW Kreher also completed psychological assessments on January 5, 2012; May 16, 2012; May 16, 2013; and November 8, 2013. (T.622-25; 626-29; 630-33; 634-37). Dr. Nanavati's opinion was not inconsistent with those offered by Plaintiff's treating therapist, LCSW Kreher.

The ALJ dismissed Dr. Nanavati's statement that Plaintiff's medication regime could cause side-effects of drowsiness and mental fog by noting that "it appear[ed] that when side effects were reported, medication was changed." (T.30 (citing Ex. 7F at 31). The ALJ only cites one treatment note from February 29, 2012, which indicates that her "meds were changed from symbyax to zyprexa." (T.387). The note does not indicate why these medications were changed. Thus, it is unclear how this treatment note undermines Dr. Nanavati's assertion, in 2014, that Plaintiff's combination of prescriptions "can cause drowsiness and mental fog." As Plaintiff points out, she was prescribed multiple psychotropic drugs(Eskalith

CR (lithium);[4] Saphris;[5] Prozac;[6] Artane;[7] and Atarax.[8]  and a drug to treat the side effects of one of those drugs.

Next, the ALJ's statement that Plaintiff "only needed followed [sic] up for routine medication checks, i.e., in four months or six months" (T.30), mischaracterizes the record. As noted above, in

_____

[4]     Eskalith CR is form of lithium. The following neuromuscular/central nervous system adverse reactions have been reported and appear to be related to serum lithium levels, including levels within the therapeutic range: tremor, muscle hyperirritability (fasciculations, twitching, clonic movements of whole limbs), hypertonicity, ataxia, choreo-athetotic movements, hyperactive deep tendon reflex, extrapyramidal symptoms including acute dystonia, cogwheel rigidity, blackout spells, epileptiform seizures, slurred speech, dizziness, vertigo, downbeat nystagmus, incontinence of urine or feces, somnolence, psychomotor retardation, restlessness, confusion, stupor, coma, tongue movements, tics, tinnitus, hallucinations, poor memory, slowed intellectual functioning, startled response, worsening of organic brain syndromes, myasthenia gravis (rarely), fatigue, and lethargy.  See https://dailymed.nlm.nih.gov/dailymed/archives/fdaDrugInfo.cfm?archiveid=4827 (last accessed Feb. 17, 2018).

[5]     Saphris is used to treat, e.g., bipolar mania in adults, as an adjunct to lithium or valproate. In such patients, commonly observed adverse reactions are somnolence and oral hypoesthesia. See https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=17209c32-56eb-4f84-95 4d-aed7b7a1b18d (last accessed Feb. 17, 2018).

[6]     Prozac (fluoxetine) is used to treat, among other things, major depressive disorder. Common side effects include somnolence, anxiety, and nervousness. https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=c88f33ed-6dfb-4c5e-bc 01-d8e36dd97299 (last accessed Feb. 17, 2018).

[7]     Atarax (hydroxyzine hydrochloride) is used, among other things, to provide symptomatic relief of anxiety and tension associated with psychoneurosis and as an adjunct in organic disease states in which anxiety is manifested. https://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=7eaf5043-5c73-47af-90 4b-8e1fae02af2e (last accessed Feb. 17, 2018).

[8]     Artane (trihexyphenidyl) is an anticholinergic used, among other things, to treat involuntary movements due to the side effects of certain antipsychotic drugs.  Common side effects include drowsiness, dizziness, nausea, nervousness, and blurred vision. https://www.webmd.com/drugs/2/drug-6683/artane-oral/details (last accessed Feb. 17, 2018).

addition to the medication checks, Plaintiff regularly attended group therapy sessions and individual counseling appointments to attend to her mental health. "A reason, such as this, that relies on a mischaracterization of the record cannot be a 'good reason.'" Wilson v. Colvin, 213 F. Supp.3d 478, 485 (W.D.N.Y. 2016) (collecting cases). The ALJ's critique of Dr. Nanavati's opinion as inconsistent with his notes, because his notes indicated "no overall concern" about Plaintiff's mental condition, is not a good reason. First, it is unclear to the Court what the ALJ meant by "overall concern," or how this vague observation by a layperson undermines the specific limitations detailed in Dr. Nanavati's opinion. The records indicate that Plaintiff suffers from significant mental health diagnoses for which she has received continuous treatment during the relevant period. The Commissioner has not pointed to any discussion in Dr. Nanavati's records about weaning Plaintiff off any of her medications, or discontinuing therapy or treatment, or reducing the frequency of her appointments. A claimant does not have to be in acute emotional distress every minute of the day or on the verge of decompensating in order to qualify as disabled due to mental impairments. Second, it "is unreasonable to expect a physician to make, on his own accord, the detailed functional assessment demanded by the Act in support of a patient seeking [disability] benefits." Ubiles v.

<u>Astrue</u>, No. 11-CV-6340T(MAT), 2012 WL 2572772, at *9 (W.D.N.Y. July 2, 2012).

Finally, the ALJ noted, Dr. Nanavati's opinion "does not appear to consider the claimant's drug and alcohol abuse issues." (T.30). It is unclear what she meant by this; the Court surmises that she is implying that Dr. Nanavati did not consider what her limitations would be in the absence of drug and alcohol abuse issues. This reason is both contrary to the ALJ's findings, and the record. The ALJ herself found that Plaintiff's alcohol dependence and marijuana abuse was in reported remission. (T.21). Furthermore, non-examining review consultant Dr. Gitlow, stated that "[t]he record *does not suggest that significant substance use has been an issue* during the period from 1/1/12 to the present other than immediately prior to the 1/17/12 partial hospital admission." (T.863 (emphasis supplied)). Thus, at the same time that the ALJ criticizes Dr. Nanavati for allegedly not considering Plaintiff's drug and alcohol abuse issues as being contributory causes to her mental illness symptoms, she assigned "great weight" to Dr. Gitlow, who essentially concluded the same thing. (<u>See</u> T.31 (Dr. Gitlow "noted that the evidence established the existence of a substance use disorder that was *only relevant for 1/17/12 to 2/7/12* hospital stay.") (emphasis supplied)). Dr. Nanavati certainly was aware that one of Plaintiff's Axis I diagnoses is alcohol abuse, in addition to her primary diagnosis of bipolar I disorder (current or

most recent episode major depressive, severe with psychotic features). (E.g., T.639). However, the records indicate that during sobriety, her mental health diagnoses persisted, as well as her need for an extensive pharmacological regime along with individual counseling and group therapy. The ALJ's decision is thus internally inconsistent and relies on a selective reading of the record in order to justify the discounting of the treating psychiatrist's opinion in favor of the non-treating, non-examining consultant's opinion.[9] Courts in this Circuit have regularly observed that "[p]articularly where psychiatric status is at issue, the opinions of non-examining physicians should be accorded less weight than those of treating physicians." O'Connor v. Astrue, No. 07-CV-141, 2009 WL 3273887, at *6 (W.D.N.Y. Oct. 9, 2009) (citing Westphal v. Eastman Kodak Co., No. 05-CV-6120, 2006 WL 1720380 (W.D.N.Y. June 21, 2006)).

**VI.      Remedy**

Under 42 U.S.C. § 405(g), the district court has the power to affirm, modify, or reverse the ALJ's decision with or without remanding for a rehearing. Remand for additional fact development may be appropriate if "there are gaps in the administrative record

---

[9]

Despite giving "great weight" to the non-examining, non-treating medical source, Dr. Gitlow, the ALJ rather incongruously did not accept his assessments of Plaintiff's limitations in the domains of functioning (Dr. Gitlow found that Plaintiff had no restrictions of activities of daily living, no difficulties in maintaining social functioning, and no difficulties in maintaining concentration, persistence or pace). (T.865). The ALJ found, instead, that Plaintiff had mild restrictions in those areas.

or the ALJ has applied an improper legal standard." <u>Rosa v. Callahan</u>, 168 F.3d 72, 82–83 (2d Cir. 1999). The standard for directing a remand for calculation of benefits is met when the record persuasively demonstrates the claimant's disability, <u>Parker v. Harris</u>, 626 F.2d 225, 235 (2d Cir. 1980), and where there is no reason to conclude that the additional evidence might support the Commissioner's claim that the claimant is not disabled, <u>Butts v. Barnhart</u>, 388 F.3d 377, 385–86 (2d Cir.2004).

As discussed above, Defendant has failed to explain satisfactorily why the opinion of Plaintiff's treating psychiatrist was not afforded controlling weight by the ALJ, who unjustifiably gave controlling weight to the non-examining, non-treating review consultant. Substantial evidence exists in the record to warrant giving deference to the opinions of Plaintiff's treating psychiatrist, and when that deference is accorded, a finding of disability is compelled. <u>See</u> <u>Spielberg v. Barnhart</u>, 367 F. Supp.2d 276, 283 (E.D.N.Y. 2005) ("[H]ad the ALJ given more weight to the treating sources, he would have found plaintiff disabled. . . ."). In the present case, further administrative proceedings would serve no purpose. Accordingly, remand for the calculation of benefits is warranted. <u>See</u> <u>Parker v. Harris</u>, 626 F.2d 225, 235 (2d Cir. 1980).

**VII. Conclusion**

For the foregoing reasons, the Commissioner's decision is reversed. Plaintiff's motion for judgment on the pleadings is

granted, and the matter is remanded for calculation and payment of benefits. Defendant's motion for judgment on the pleadings is denied. The Clerk of Court is directed to close this case.

**IT IS SO ORDERED.**

S/Michael A. Telesca

_____
HON. MICHAEL A. TELESCA
United States District Judge

Dated:     February 20, 2018
           Rochester, New York.